# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

<table>
<tr><td>CAROLE CHENEY,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Case No: 13 C 4269</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Magistrate Judge Susan E. Cox</td></tr>
<tr><td>STANDARD INSURANCE COMPANY,</td><td>)</td><td></td></tr>
<tr><td>and LONG TERM DISABILITY</td><td>)</td><td></td></tr>
<tr><td>INSURANCE,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## ORDER

This is an ERISA action to determine whether plaintiff had insurance coverage on the date of her alleged disability and, if so, whether plaintiff established that she was disabled within the meaning of the policy. The parties agreed to a trial on the stipulated paper record, therefore, before us are both Plaintiff Carole Cheney's Motion for Entry of Judgment [dkt. 29] and Defendants Long Term Disability Insurance and Standard Insurance Company's Motion for Judgment [dkt. 38]. For the reasons provided, we hereby grant plaintiff's motion and deny defendants' motion.

## STATEMENT

Plaintiff filed this suit under the Employee Retirement Income Security Act ("ERISA") for defendants' failure to pay her long-term disability benefits. The case presents two principle issues: whether plaintiff, Carole Cheney, had insurance coverage on her date of disability, making her eligible for long-term disability benefits and, if so, whether plaintiff can establish that she indeed was disabled under the policy. Defendants, Standard Insurance Company and

Long Term Disability Insurance, argue several reasons for plaintiff's lack in coverage during the relevant time period. But even if she was covered, they assert that she cannot establish disability because of her lack of consistent medical treatment, Standard's consulting physicians' opinions that she was capable of sedentary work, and because there were no objective measurements of functional limitations at the time she ceased work.

Both parties have filed motions for judgment on the pleadings, submitting briefs for a trial on the papers.[1] We will make an independent decision about plaintiff's eligibility for benefits, pursuant to the *de novo* standard of review.[2] The parties agree that this particular policy is subject to that standard, which requires the Court to weigh all of the medical evidence as the finder of fact.[3] In doing so, we must "interpret the terms of the policy in an ordinary and popular sense as would a person of average intelligence and experience."[4] What happened before the plan administrator, therefore, is irrelevant.[5]

Plaintiff was a long-time attorney at Kirkland & Eillis LLP, eventually becoming a non-share partner specializing in appellate and commercial litigation. Though disputed as to severity, plaintiff has had a twenty year history of back and neck pain, with periods of "flare-ups" that have required physical therapy and surgery, having her work station modified pursuant to an ergonomic assessment, and ultimately working from home on most days starting in 2003. Because we review this under the *de novo* standard, we will discuss her medical history in the context of whether she satisfied the definition of "Disability" in defendants' policy. But first we look to whether, as defendants argue, plaintiff was no longer covered under the policy when she stopped working.

---

[1] *See Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir. 2001)("a trial on a stipulated paper record is equivalent to a conventional trial on (largely) oral evidence").
[2] *Krolnik v. Prudential Ins. Co. of Am.,* 570 F.3d 841, 843 (7th Cir. 2009).
[3] *Krolnik,* 570 F.3d at 844.
[4] *Ross v. Ind. State Teacher's Ass'n Ins. Trust,* 159 F.3d 1001, 1011 (7th Cir.1998).
[5] *See Patton v. MFS/Sun Life Financial Distributors, Inc.,* 480 F.3d 478, 485-86 (7th Cir. 2007).

## I. Eligibility for Coverage[6]

Defendants argue that plaintiff's coverage terminated on December 20, 2011 because she ceased working on December 19, 2011. Not disputed is that plaintiff took a leave of absence from the law firm beginning on January 3, 2012. Everything else, however, is disputed.

Plaintiff explains that she sought and received approval for the leave of absence from the firm's Benefit Services Manager.[7] Though plaintiff asserts that she was not required to specify why she was taking the leave,[8] it is apparent from the chronology of events that she was pursuing treatment for her back pain and that the leave of absence allowed her to essentially cease "all desktop computer use," which had become increasingly more painful over the years.[9]

The problem is, there are several documents that indicate plaintiff's last day of work – before her disability began – to be December 19, 2011, including plaintiff's Complaint, the application for the disability benefits,[10] and her letter appealing the disability determination.[11] Defendants argue that coverage stopped that day, because it is the day she stopped working. The policy governs when a participant's insurance coverage will end, stating,

> Your insurance ends automatically on the earliest of:
> 
>                                    \*\*\*
> 
> 4. The date you cease to be a Member. However, your insurance will be continued during the following periods when you are absent from Active Work, unless it ends under any of the above:

---

[6] Plaintiff's Proposed Findings of Facts and Conclusions of Law will be cited as "PFF" and Defendants' Proposed Findings of Fact and Conclusions of Law will be cited as "DFF." We will also cite directly to the record where appropriate.

[7] Def's Resp. to PFF ¶54 (the parties did not agree as to whether approval was received in November or December 2011).

[8] PFF ¶53.

[9] PFF ¶18.

[10] STND 00665.

[11] STND 00497; Def's Resp. to PFF ¶49.

a. During the first 90 days of a temporary or indefinite administrative or involuntary leave of absence or sick leave, provided your Employer is paying you at least the same Predisability Earnings paid to you immediately before you eased to be a Member. A period when you are absent from Active Work as part of a severance package or other employment termination agreement is not a leave of absence, even if you are receiving the same Predisability Earnings.

b. During a leave of absence if continuation of your insurance under the Group Policy is required by a state-mandated family or medical leave act or law.

c. During any other temporary leave of absence approved by your Employer in advance and in writing and scheduled to last 9 months or less. A period of Disability is not a leave of absence.

d. During the Benefit Waiting Period.[12]

Defendants rely on this language, that a participant's insurance "ends automatically" on the "date you cease to be a Member."[13] The policy defines a Member as "a regular employee" who is "[a] partner of the Employer who is Actively At Work for the Employer," which includes "regularly scheduled days off, holidays, or vacation days, so long as the person is capable of Active Work on those days."[14] Defendants argue that it is more likely that plaintiff's coverage ended even before December 20, 2011 because she had been working from home for several years. Defendants' argument here focuses on the "Active Work" clause found in the policy. It provides that a participant,

must be capable of Active Work on the day before the scheduled effective date of your insurance or your insurance will not become effective as scheduled. If you are incapable of Active work because of Physical Disease, Injury, Pregnancy or Mental Disorder on the day before the scheduled effective date of your insurance, your insurance will not become effective until the day after you complete one full day of Active Work as an eligible Member.

Active Work and Actively At Work mean performing with reasonable continuity the Material Duties of your Own Occupation at your Employer's usual place of business.[15]

---

[12] STND 00789.
[13] DFF ¶7.
[14] DFF ¶5.
[15] STND 00788.

Defendants do not cite to the initial portion of this clause that puts this language in the context of when the insurance becomes *effective* but, instead, only focus on the portion that defines "Active Work" as "performing with reasonable continuity the Material Duties of your Own Occupation at your Employer's usual place of business." In other words, defendants argue that plaintiff had not been actively at work – within the meaning of the policy – for quite some time because she was working from home and not in the firm's "usual place of business." Defendants then cite to *McKay v. Reliance Standard Life Insurance Company,* a Sixth Circuit case where the court dealt with similar language, finding the employee had not received permission to work from home, thus, his work at home did not "override the plain requirements of the policy that he perform his job in the normal location."[16] Ultimately, however, that court focused on the employee's failure to establish working the proper number of hours a week, meaning he did not establish that he performed his job in the manner that it is "normally performed."[17]

Here, plaintiff had permission to work from home for many years, there being no dispute that she had set up an office at home and often completed her work duties there. We also find it out of context for defendants to argue this provision would preclude plaintiff from being eligible for benefits. In fact, it is a stretch to claim that plaintiff, a lawyer with Kirkland for twenty years, immediately ceased being a "Member" two weeks before her scheduled leave of absence simply because this is the date she indicated as her last day of work prior to her leave. And as is noted above, the insurance is continued when "absent from Active Work" during "any other temporary leave of absence approved by" the employer "in advance and in writing scheduled to last 9

---

[16] 428 Fed.Appx. 537, 544 (6th Cir. 2011).
[17] *McKay,* 428 Fed.Appx. at 544.

months or less."[18] There is no dispute that plaintiff's leave of absence was approved to last for 6 months.[19]

It is true that plaintiff only now explains that between December 20, 2011 and her period of leave in January she took off two weeks for the holidays and used her sick days. But such an explanation – whether brought initially or now – does not change the application of the "Active Work" provision. That provision is written in the context of when insurance coverage becomes effective, which is not at issue here. The parties do not dispute that this policy covered plaintiff prior to December 19, 2011, meaning it was already "in effect."[20] Even in *McKay,* the court discussed similar "Active Work" language in the context of determining which of two policies were "in effect" at the time of the employee's disability. That is because, in *McKay,* the company changed benefit providers during the time the employee was unofficially gone from work (and, importantly, he claimed he was unable to work during that time in order to qualify as having suffered a loss of earnings, necessary for coverage).[21]

Standard argues that there is no proof in the record that plaintiff was taking time off for the holiday starting on December 20, using vacation days, or that she was applying sick days to that two week period. But there is also nothing in the record to dispute it. It is unlikely that law firm partners document all of their vacation days, for example, with the human resources department. And it is certainly reasonable to assume that just prior to the Christmas holiday plaintiff was taking time off.

Because we find that nothing plaintiff did between December 19, 2011 and January 3, 2012 - when her approved leave began - resulted in coverage ending, we move on to address

---

[18] STND 00789.
[19] STND 00434; KE0000033.
[20] Def's Resp PFF ¶5.
[21] *McKay,* 428 Fed.Appx. at 541.

defendants' position that coverage ends on either April 3 or alternatively July 31, 2012. Yet plaintiff argues a different date altogether, claiming coverage continued through September 19, 2012.[22] These dates should reflect coverage ending after either "90 days" of "temporary or indefinite administrative or involuntary leave of absence or sick leave" (provision 4(a) quoted above) or after nine months, pursuant to the provision that coverage ends after "any other temporary leave of absence approved by your Employer…scheduled to last 9 months or less" (provision 4(c) quoted above).[23]

Defendants argue that the leave of absence plaintiff was granted should be considered "sick leave" because paid medical leave is synonymous with sick leave. To support this, defendants refer to the three types of leave options available to plaintiff, medical leave being one of them. The policy provides that "Partners may take a medical leave of absence when they have an illness or disability that requires them to be away from work for an extended period of time."[24] In the email confirming plaintiff's paid leave of absence, the reason provided was "Medical"[25] though a letter from the law firm's Director of Benefits indicated eligibility is not dependent on "the need to provide details regarding the reason for that leave."[26]

Plaintiff argues that she did not indicate the reason for her leave and nowhere in the policy does it require that she do so. Plaintiff then explains that the clause defendants would like to apply here – referring to involuntary or administrative leave – is more appropriate where an employer removes an employee from duty, citing Personnel Rules.[27] Plaintiff asserts that because her leave was not involuntary, or administrative, and she did not request the leave under the auspices of "sick leave," it fits more closely under the provision of "temporary leave of

---

[22] STND 00511.
[23] STND 00789.
[24] KE0000031.
[25] Pl's Resp DFF ¶30; KE0000010.
[26] STND 00483.
[27] 80 Ill.Admin.Code 302, 302.795.

absence approved by your Employer in advance and in writing and scheduled to last 9 months or less."[28]

We agree. The correspondence with plaintiff's employer regarding her leave does not indicate that it would be sick leave. The communications, rather, refer to her right as a partner to take up to six months of paid leave, during which time "health and welfare benefits remain at the same level as for a Partner actively at work."[29] Though we acknowledge the potentially conflicting provisions, because the three types of leave options only allow for one to apply here – medical leave – we also note the rule that when potentially conflicting provisions exist, we have to read the contract parts as an integrated whole in an effort to reconcile the provisions.[30] The provision dictating when coverage ends is more appropriately the provision referenced by plaintiff, because she indeed received approval, in advance and in writing by her employer, for a temporary leave, that was to last six months. Considering any ambiguity in the policy in favor of the insured,[31] the appropriate date for coverage to end is nine months after her temporary leave, which would be in September 2012.[32]

## II.    Proof of Disability

We now move to the issue of disability. Plaintiff explains that after years of struggling with severe pain, she finally reached a point where she could no longer sit or stand for prolonged periods of time, or work at a desktop computer, without debilitating cervical spinal pain. Because the policy language is "occupation-specific," plaintiff need only show that she cannot "perform with reasonable continuity the Material Duties of [her] Own Occupation."[33] Defendants assert

---

[28] STND 00789.
[29] *See* STND 00454; KE0000032.
[30] *See Diehl v. Twin Disc.,* 102 F.3d 301, 307 (7th Cir. 1996).
[31] *Northbrook Excess & Surplus Ins. Co. v. Proctor & Gamble,* 924 F.2d 633, 638 (7th Cir. 1991).
[32] Plaintiff completed her sixth months of paid leave on June 29, 2012 (KE0000044).
[33] PFF ¶7.

that she is, however, still capable of performing the sedentary work of a lawyer. They refer to the lack in medical evidence showing work restrictions or documentation that plaintiff should stop working. Defendants also focus on plaintiff's "exaggerated portrayal of her stressful and time-consuming occupation," claiming that, in reality, plaintiff worked a flexible 21-hour work week from home.[34]

## A. Relevant Policy Language

The parties agree that plaintiff's eligibility for benefits is determined based on whether she is unable to perform her "own occupation." The policy provides,

> During the Benefit Waiting Period and the Own Occupation Period, you are required to be Disabled only from your Own Occupation.
>
> You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy, or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation.

The policy then defines "Own Occupation" and "Material Duties" to mean,

> **Own Occupation** means any employment, business, trade, profession, calling, or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy. If your Own Occupation involves the rendering of professional services and you are required to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license.
>
> **Material Duties** means the essential tasks, functions, and operations, and the skills, abilities, knowledge, training, and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.

## B. Medical History

Though disputed, plaintiff claims her neck and lower back problems started back in 1994, when she first notified her employer that computer use was painful and sought ergonomic

---

[34] Defs' Mem. in Support, dkt. 44, p. 26.

accommodations in her office.[35] In 2003 plaintiff transitioned to working mostly from home, which corresponds with medical records documenting her hip and low back pain.[36] As defendants point out, however, treatment records only span between 2007 to April 2012.[37] In 2007, plaintiff had five physical therapy and four occupational therapy sessions.[38] Plaintiff apparently started therapy again in 2009 through April 2012, participating in multiple physical therapy sessions, though somewhat inconsistently.[39] Some of the treatment notes during this time document plaintiff feeling "achy and sore as her job responsibilities have increased," and in response to whether her condition was getting worse, plaintiff noted it was "up & down."[40]

By 2011, plaintiff claims that her condition became intolerable. Physical therapy notes in April and May show pain from sitting for prolonged periods of time and constant pain that makes it hard for her to "concentrate while trying to work."[41] However, defendants refer to treatment notes during this time where plaintiff reported feeling "improved in both the neck and back," and though she continued to have the same pain, it was noted as worsening due to both packing for a move (spending time "in crawl space" at her home), straining her hip, and pulling her bag through an airport for a flight change.[42] Defendants point out that therapy notes recommend she increase her visits to two or three times per week, yet there is a gap in treatment from July to October 2011.[43]

By November 2011, plaintiff's chiropractor noted that plaintiff's pain "inhibits her ability

---

[35] PFF ¶18.
[36] STND 00237.
[37] Def's Resp. PFF ¶19.
[38] STND 00228-236.
[39] STND 00165-168; 00299-395.
[40] Def's Resp. to PFF ¶35.
[41] Def's Resp. to PFF ¶40.
[42] Def's Resp. to PFF ¶41.
[43] Def's Resp. to PFF ¶41.

to perform her job, and disrupts every [activity of daily living] once exacerbated"[44] and indicated that plaintiff "only felt better when she had a break from paperwork/computer."[45] Though these records are indeed accurate, defendants dispute them and refer to a cervical spine questionnaire filled out by plaintiff's chiropractor a year later, in November 2012. On this form, it is noted that both "[m]oderate stress is okay" and that plaintiff is "capable of high stress work," explaining "she can tolerate stress of high work load, but not physical stress of prolonged sitting [at] computer."[46] At this time plaintiff inquired about taking a leave of absence, and plaintiff's chiropractor ordered a MRI of her cervical spine.[47]

After plaintiff started her leave of absence, she claims her condition worsened and by March 2012 her chiropractor recommended that she consult with a specialist.[48] The next month plaintiff saw neurosurgeon Douglas Johnson, M.D., Ph.D., who recommended a twelve-week physical therapy program with concurrent cervical epidural injection therapy with pain specialist Narayan Tata, M.D.[49] By June 2012 Dr. Tata performed a cervical discogram showing "internal disc disruption" indicating plaintiff's pain was "emanating from the C5-C6 disc level."[50] Because of "no notable change in her condition," and an indication that physical therapy seemed to make plaintiff feel worse, Dr. Johnson recommended surgery "to decompress nerve tissue."[51] Dr. Johnson also indicated that plaintiff was "unable to work."[52]

## C. Application for Disability

Plaintiff exhausted her six-month leave of absence on June 30, 2012, and ceased

---

[44] PFF ¶45.
[45] PFF ¶46.
[46] STND 00084.
[47] PFF ¶48; STND 00321.
[48] PFF ¶60.
[49] Def's Resp. PFF ¶63.
[50] Def's Resp. PFF ¶67.
[51] Def's Resp. PFF ¶70.
[52] STND 00148.

receiving a salary on that date.[53] But plaintiff received approval for an unpaid extension of her leave to July 31, 2012.[54] That same month, though again disputed as to whether plaintiff supplied the necessary documents, on July 17, 2012 (following the insurance policy's "180 day Benefit Waiting Period"), plaintiff submitted a claim for long term disability benefits.[55]

In August 2012, prior to issuing its decision, plaintiff underwent surgery to fuse her cervical spine.[56] During surgery it was discovered that plaintiff's C5 disc was unstable, requiring it to be removed.[57] Plaintiff wore a fixed collar for six months post-surgery to restrict her neck movement.

On October 9, 2012, Standard informed plaintiff that her claim for long term disability benefits was denied.[58] In evaluating plaintiff's claim for benefits, defendant Standard consulted with three specialists: a physician consultant, John Hart, D.O., an orthopedic surgeon, David Waldram, M.D., and a Vocational Rehabilitation Counsellor, Jan Cottrell.[59] Both physicians reviewed plaintiff's medical files but did not examine plaintiff. Dr. Waldram concluded that plaintiff,

> would have been able to work at a sedentary level position up to the time of surgery as long as she was able to change workstation positions, which in my understanding had been allowed, moving and standing after periods of sitting for 45 minutes to an hour.
>
> ***
>
> I find no evidence that desktop use of the extremity would be an issue as she has no neurologic findings. Her low back would require again moving around in the workplace avoiding prolonged sitting.

He further opined that plaintiff would need to be off work for three months post-surgery, but able

[53] PFF ¶71.
[54] PFF ¶72.
[55] PFF ¶73.
[56] PFF ¶¶78-80.
[57] PFF ¶¶79-80.
[58] DFF ¶100.
[59] DFF ¶¶88-90.

to return to sedentary work without limitations.[60] Dr. Hart reviewed plaintiff's files twice, the initial report finding that she was capable of performing "a sedentary level occupation without limitations,"[61] and the second report, after receiving medical records from plaintiff's neurosurgeon, Dr. Johnson, found the same (though noting that plaintiff required time to heal from surgery).[62]

The vocational counselor also submitted a report documenting that the occupation of a lawyer would be defined as "sedentary as it is generally performed" and noted,

> A lawyer could further alternate between periods of sitting and periods of standing or walking by making use of commonly accessible ergonomic accommodations. Equipment such as a sit/stand station for duties involving computer work or keyboarding as well as a standing height desk for tasks such as paperwork or document reviews would allow an individual to further vary the amount of time spent in different positions.[63]

The report additionally found that these accommodations would allow a lawyer to go from sitting to standing about every 45 minutes.[64]

Standard's denial letter agreed with the physician consultants who found plaintiff capable of "sedentary level work with the ability to alternate positions up until" plaintiff's surgery, and adopted the vocational counselor's determination that plaintiff could access jobs within her own occupation, as defined in the policy.[65] Plaintiff appealed the decision, submitting additional documentation from her chiropractor, Dr. Tata, statements from family members, and a letter from Kirkland's benefits director.[66]

The new report from her chiropractor in November 2012 found a neck impairment and

---

[60] STND 00129-130.
[61] STND 00141.
[62] STND 00117.
[63] STND 00668.
[64] *Id.*
[65] STND 00619.
[66] DFF ¶¶105-106.

headache pain affected plaintiff's concentration, and found she was unable to tolerate the stress of prolonged computer use.[67] But defendants discount this report, noting that plaintiff last saw her chiropractor over six months prior to this report (in April) and refer to his failure to answer certain questions on the form, such as plaintiff's ability to "sit, stand, and walk in an 8-hour working day," responding "not known."[68] Plaintiff then references Dr. Tata's additional questionnaire, also completed in November, where she found plaintiff capable of only low stress jobs due to her pain. Plaintiff alleges that this questionnaire was a result of an evaluation by Dr. Tata, whereas defendants point out that there is no record of Dr. Tata seeing plaintiff after June 2012.[69] (Plaintiff asserts that she was not seeing her doctors during this time because she was recovering from surgery).

With this new information, Standard consulted an additional physician, Hans Carlson, M.D. Ultimately, Dr. Carlson concluded that the limitations noted by Dr. Tata and plaintiff's chiropractor were consistent with the ability to perform sedentary work.[70] Seven months after initially denying benefits, on May 10, 2013, Standard upheld its decision to deny plaintiff's disability claim.

### D. Analysis

Because plaintiff seeks to enforce the policy, she bears the burden of proving that she is entitled to these contract benefits.[71] Whether plaintiff meets that burden – of showing that she cannot "perform with reasonable continuity the Material Duties of [her] Own Occupation" – first depends on our determination of the nature of plaintiff's job duties.[72]

Plaintiff described her work duties on Standard's disability form, stating she is a partner

---

[67] PFF ¶117.
[68] Def's Resp. PFF ¶117.
[69] Def's Resp. PFF ¶118.
[70] DFF ¶121.
[71] *Ruttenberg v. U.S. Life Ins. Co. in City of N.Y,* 413 F.3d 652, 663 (7th Cir. 2005).
[72] *See Lockhart v. Jefferson Pilot Financial Ins. Co.,* No. 03 CV 1745, 2009 WL 901140, *14 (N.D. Ill. March 31, 2009)(assessing the nature of the plaintiff's job duties to determine whether she was disabled under the policy).

and engages "in legal research on the computer, and write[s] briefs and other papers such as memoranda and strategy papers."[73] The parties dispute the physical requirements of plaintiff's job only in that defendants focus on the flexibility plaintiff has to alternate tasks, and take breaks when she needs to. But plaintiff claims that strict deadlines and the need to work long hours, often at a computer, do not allow for the accommodations she would need to avoid pain.

The vocational counselor consulted by Standard defined the work of a lawyer as "Sedentary" that "involves sitting most of the time, but may involve walking or standing for brief periods of time."[74] Putting aside defendants' focus on plaintiff's reduced-hour, flexible, schedule, we find it reasonable to assume plaintiff is still required to concentrate mentally for long periods of time on complex legal matters.[75] We also agree that despite plaintiff's ability to work from home and often take breaks, a litigation partner would necessarily be required to work according to deadlines that would, at times, require long hours at the computer.

Now we look to the interpretation of the policy language. We again note that the policy defines "own Occupation" to include "the way you perform your job for your Employer," but also "the way the occupation is generally performed in the national economy."[76] The policy defines "Material Duties" to mean "the essential tasks, functions, and operations, and the skills…that cannot be reasonably modified or omitted."[77] Confirming that plaintiff can "alternate between periods of sitting and periods of standing or walking" and make use of ergonomic accommodations, the vocational counselor concluded that plaintiff could perform work within her "Own Occupation."[78]

---

[73] STND 00658.
[74] STND 00668 (citing the Dictionary of Occupational Titles).
[75] *See Lain v. Unum Life Ins. Co. of Am.,* 279 F.3d 337, 345 (5th Cir. 2002)(noting plaintiff's job as an attorney was described as requiring the ability to concentrate for long periods of time on complex matters).
[76] PFF ¶7.
[77] PFF ¶7.
[78] *Id.*

But plaintiff argues that under an occupation-specific disability insurance policy, an insured is entitled to recovery so long as that individual is unable to perform even a single material job duty. In the case of plaintiff, because she experiences pain while sitting, which hinders her ability to concentrate, she argues that she is unable to fulfill both the physical and cognitive requirements of her "Own Occupation."

Plaintiff principally relies on *McFarland v. General American Life Insurance Company,* where the Seventh Circuit analyzed policy language requiring that a person be "totally disabled" to receive benefits.[79] That term was defined as "'unable to perform the material and substantial duties of [his] regular occupation.'"[80] In that case the parties agreed that the plaintiff was unable to perform 65% of his former duties.[81] The court was left to determine, then, whether that reduction in abilities rendered the plaintiff unable to perform the "material and substantial duties" of his job.[82]

The court held that the purpose of the policy was "to protect the individual whose economic expectations and commitments are disrupted by a change in occupational status due to injury or sickness."[83] It found, therefore, that both qualitative and quantitative reductions in one's performance could fit within the policy's definition of inability to perform "the material and substantial duties" of his or her job.[84] The court explained, first, that a qualitative reduction is when a person loses "one of several core skills" of the job, or loses the ability to perform an "essential duty" of the regular occupation, which would result in the loss of the position (using a baseball analogy with a shortstop's loss of his ability to throw).[85] Second, a quantitative

---

[79] 149 F.3d 583 (7th Cir. 1998).
[80] *McFarland,* 149 F.3d at 586.
[81] *McFarland,* 149 F.3d at 586.
[82] *McFarland,* 149 F.3d at 586.
[83] *McFarland,* 149 F.3d at 588.
[84] *McFarland,* 149 F.3d at 588.
[85] *McFarland,* 149 F.3d at 588.

performance reduction would not "physically prevent an employee from performing any given task," but the injury would instead render the person "unable to perform enough of the tasks or to perform for a long enough period to continue working at his regular occupation."[86] In that example, even a reduction to 25% of a person's prior output would result in a quantitative loss, rendering the person "totally disabled" under that policy.[87]

Plaintiff also refers to our sister courts that have determined, where the policy language is occupation-specific, the loss of a single material job duty is sufficient to find disability. For example, in *Lockhart v. Jefferson Pilot Financial Insurance Company,* Judge Coar held that "even if plaintiff's hands can *literally* grasp a telephone, but doing so would exhaust her or cause her pain, then she cannot be said to be able to *functionally* perform that task."[88] And in *Rahman v. Paul Revere Life Insurance Company,* Judge Aspen found that because it was uncontroverted that one of the "essential aspects" of the plaintiff's pre-injury job, who was an emergency room cardiologist, was to run to his patients, his inability to run alone rendered him disabled.[89]

A fair reading of the policy language here supports the view that to be considered disabled, plaintiff must be unable to perform only a single material duty of her occupation. At this point in our analysis, then, we must determine whether the severity of her condition, degenerative disease of her cervical spine, has caused her such severe pain that an "essential" or material duty of her job has been lost. Defendants paint a picture of plaintiff's condition as lacking in consistent treatment, with few serious problems documented by medical professionals, and a work history that had limited hours and maximum flexibility.

We acknowledge that plaintiff's medical history up to 2011 is somewhat intermittent and

---

[86] *McFarland,* 149 F.3d at 588.
[87] *McFarland,* 149 F.3d at 588.
[88] No. 03 CV 1745, 2009 WL 901140 at *14 (emphasis in original).
[89] 684 F.Supp. 192, 194-95 (N.D. Ill. April 20, 1988) (analyzing an occupational disability policy where the insured had to be "unable to perform the substantial and material duties of his regular occupation...").

not always consistent. It can be summarized as chiropractic therapy, home exercise, physical therapy, and applying ice and heat packs.[90] Plaintiff began regular chiropractic treatment in October 2009[91] but then dropped off of any treatment schedule again in 2010.[92] This coincided with plaintiff's time off work while she ran for DuPage County Board Chairman.[93] When plaintiff returned to work, she again started chiropractic treatment.[94] But then in early 2011 plaintiff dropped off treatment.[95] By April 2011 plaintiff was again receiving chiropractic treatment where notes document her prolonged hours at the computer caused increased pain and that her home exercise program was "not successful once the prolonged sitting begins."[96] Similar notes several months later indicate that though she felt improvement, sitting long hours in court exacerbated her condition and her schedule made it difficult to find time for therapy.[97] After another break in treatment from August to October 2011, plaintiff returned to chiropractic treatment. Notes during this time similarly reference her complaints that computer use and sitting exacerbated her condition.[98] Throughout this time plaintiff's primary pain medications were ibuprofen and aspirin,[99] though earlier records indicate that she had tried Celebrex and injections.[100]

More significant treatment does not begin until April 2012, during her leave of absence from work. At this time plaintiff consulted with a neurologist and pain specialist and started cervical epidural spinal injections.[101] Four months later plaintiff had surgery.[102]

---

[90] Pl's Resp. DFF ¶75.
[91] Pl's Resp. DFF ¶42.
[92] DFF ¶45.
[93] Pl's Resp. DFF ¶¶20, 45.
[94] Pl's Resp. DFF ¶48.
[95] Pl's Resp. DFF ¶49.
[96] DFF ¶50.
[97] DFF ¶51.
[98] Pl's Resp. DFF ¶63.
[99] STND 00226.
[100] *See, e.g.,* STND 00237.
[101] PFF ¶65.

Ultimately, all of plaintiff's treating doctors and the physician consultants hired by defendants to review plaintiff's records found plaintiff was experiencing "chronic and long term" pain.[103] Her treating chiropractor completed a functional capacity questionnaire, concluding that plaintiff was unable to sit at the computer for prolonged periods, and that her pain was a constant interference with her concentration and attention.[104] Defendants focus on her chiropractor's statement that plaintiff can tolerate the stress of a high work load, but that statement is qualified by "not physical stress of prolonged sitting [at] computer."[105] (His focus on her physical capabilities is of course more appropriate for this analysis, as those are the specialized skills of a chiropractor). Her neurosurgeon, Dr. Johnson, indicated that it was "unknown" when plaintiff could return to work and when answering what barriers she had to returning to work, he indicated "cervical surgery."[106] Due to his death, however, Dr. Johnson's nurse practitioner wrote a letter on plaintiff's behalf to Standard. That letter indicated plaintiff's treatment supported "longstanding disability due to neck pain and dysfunction…"[107] Dr. Tata also completed a functional capacity questionnaire, noting plaintiff's pain was worse at the computer and that her pain would frequently interfere with attention and concentration.[108] The reviewing doctors hired by Standard also found her credible, concluding that plaintiff's medical records supported a finding that she avoid "prolonged sitting,"[109] and that she have the ability to reposition from sitting to standing or walking.[110]

---

[102] PFF ¶77.
[103] *See* Def's Resp. PFF ¶83 (quoting Standard's independent physician consultant, Dr. Hart); *see also* STND 00204 (noting plaintiff's neck pain "of many years duration" by plaintiff's neurosurgeon Dr. Johnson); STND 00129-130 (documenting "chronic difficulty with her back and neck" that is "aggravated with prolonged sitting" stated by Standard's orthopedic surgeon consultant, Dr. Waldram).
[104] Pl's Resp. DFF ¶108.
[105] STND 00084.
[106] STND 00204.
[107] Pl's Resp. DFF ¶87.
[108] STND 00090.
[109] STND 00130.
[110] STND 00055.

We cannot say that the evidence provided by plaintiff's doctors is "so overwhelming,"[111] considering that plaintiff was never on "numerous medications" for her pain, and she also does not have years of "voluminous medical records."[112] But we do agree with plaintiff that the record corroborates her pain complaints, and her attempts to use ergonomic accommodations to alleviate her pain to no avail. And the non-examining doctors relied on by Standard, who found plaintiff capable of general sedentary work, failed to opine on plaintiff's non-exertional limitations and how those would affect her ability to perform the high-stress work of a litigation partner. We can say in relying on the non-examining doctors, Standard "glossed over" the issue of plaintiff's need to concentrate and perform the "mental demands of the active practice of law."[113]

Important for this case is the distinction that the policy allows for benefits if plaintiff is unable to perform a single "essential" duty of her occupation, not whether she can perform *any* sedentary occupation. The limited conclusion that plaintiff should be able to move from a sitting to a standing position to account for her chronic pain is not reconcilable with the record evidence that she has used those accommodations for the majority of her career and has continued to suffer pain, which affects how much she can work. Therefore, it may be true that plaintiff can perform other sedentary work or even other legal work. But those of us in the profession know that a partner at a large law firm must endure "emotional stress, time pressure, long hours,"[114]

---

[111] *See Holmstrom v. Metropolitan Life Ins. Co.,* 615 F.3d 758, 775 (7th Cir. 2010)(finding the evidence provided by the plaintiff's doctors who examined her "so overwhelming" as compared to the reviewing doctors).

[112] *See Lockhart,* No. 03 CV 1745, 2009 WL 901140 at *13 (finding "voluminous medical records" and plaintiff's "numerous medications" supported plaintiff's total disability); *see also Diaz,* 499 F.3d at 646 (noting the plaintiff's pain –treatment procedures and heavy doses of strong drugs).

[113] *See Nevitt v. Standard Ins. Co.,* No. 08-3641, 2009 WL 4730316, *7 (N.D. Ga. Dec. 3, 2009)(concluding that the reviewing doctors "glossed over" evidence documenting severe migraines, and finding that there were no signs of malingering or symptom exaggeration).

[114] *See Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1098 (9th Cir. 1999) (en banc) (Reinhardt, C.J., concurring)(addressing whether material issues of fact remained as to the plaintiff's limitations from his 'specialty' in the practice of law).

and the demands of "a high level of mental acuity"[115] regardless of the accommodations of a standing desk, or a reduced hour schedule.[116]

Defendants' argument largely turns on plaintiff's inconsistent medical history and her drop in medical treatment during her run for political office in both 2010 and again in early 2012. But there is no evidence in the record about plaintiff's run for office, what that entailed, or what she was required to do during that time. It is doubtful plaintiff's campaigns consisted of similar long hours at a computer with the pressure to meet deadlines while maintaining consistent mental focus.[117] It appears, rather, that in pursuing those campaigns plaintiff was attempting to find other work that might alleviate her pain.

And we have already acknowledged that plaintiff was inconsistent in her physical therapy and did not seek more extreme pain relief until 2012, just prior to her surgery. In support, defendants rely on the principle that when objective measurements exist, it is reasonable for a plan to require more than subjective complaints.[118] But we have already referenced the objective reports by plaintiff's treating doctors indicating that her pain existed, and limited her abilities. The policy also does not require that plaintiff be disabled from her own occupation for multiple years leading up to 2012. Following the guidance of *McFarland,* qualitative and quantitative reductions in plaintiff's performance are equal to an inability to perform "the material and

---

[115] *See Teicher v. Regence Health and Life Ins. Co.,* 562 F.Supp.2d 1128, 1139 (D. Or. 2008)(defining the plaintiff's position as a lawyer and managing partner of a large law firm).

[116] *See, e.g.,* STND 00325 (October 2011 chiropractic record documenting plaintiff's report that "she had to sit prolonged hours at a computer to meet a deadline, which caused her tightness/pain in the right shoulder and right lower back."); *see also* STND 00348 (June 2011 chiropractic record documenting sitting for prolonged hours at a computer to meet a deadline caused pain); STND 00362 (April 2011 chiropractic record documenting same).

[117] *See Thivierge v. Hartford Life and Accident Ins. Co.,* No. 05cv0163, 2006 WL 823751 (N.D. Ill. March 28, 2006)(noting that campaigning for and working on the local school board "is not a forty-hour a week job," finding that such evidence did not support the plaintiff's ability to work full-time).

[118] *See Williams v. Aetna Life Ins. Co.,* 509 F.3d 317, 323 (7th Cir. 2007)(finding that a plan was not arbitrary and capricious when denying benefits where doctor failed to indicate how pain or fatigue limited the plaintiff's functional abilities).

substantial duties" of her job.[119] By the end of 2011 and into 2012, plaintiff sought more serious treatment, attempted pain therapy with no success, and ultimately required surgery. As noted, all the medical professionals who reviewed her file agreed that plaintiff had limitations due to pain. Sedentary work, in general, may accommodate such a condition, as Standard's medical consultants stated. But their conclusion did not consider the qualitative and quantitative aspects of plaintiff's work as a litigation partner. We find this is the crux of this case. Whether plaintiff can find other, less demanding, work as a lawyer is not the question. "Own occupation" is defined as "duties of the same general character" as the occupation plaintiff is "regularly performing."[120] Even looking to the duties of a litigation partner "in the national economy," as the policy allows Standard to do, the essential duties affected by plaintiff's condition remain the same. We, therefore, find that because of her reduced abilities, she was "unable to perform enough of the tasks or to perform [them] for a long enough period"[121] to continue working as a litigation partner, which sufficiently places her within the definition of Disability in the policy.

### E. Calculation of Predisability Earnings

This brings us to the parties' dispute regarding the calculation of benefits. The policy provides that "Predisability Earnings" for partners are determined based on the tax year prior to the last day of Active Work:

> Your Predisability Earnings will be based on your earnings in effect on your last full day of Active Work. However, if you are a Partner, your Predisability Earnings will be based on your prior tax year. Any subsequent change in your earnings after that last day of Active Work will not affect your Predisability Earnings.

Active Work means "performing with reasonable continuity the Material Duties of your

---

[119] *See McFarland,* 149 F.3d at 588.
[120] STND 00583.
[121] *See McFarland,* 149 F.3d at 588.

Own Occupation at your Employer's usual place of business."[122] Here the issue is what date constitutes plaintiff's last day of Active Work, as opposed to our earlier discussion of when plaintiff ceased to be a "Member." We must determine whether plaintiff's last day of Active Work was December 19, 2011 or the date her leave of absence began, January 3, 2012, or, as plaintiff suggests, even the date the Benefit Waiting Period began (or ended). Either way, the picture of plaintiff's "prior tax year" is vastly different between 2010 and 2011 because plaintiff took significant time off work in 2010.

On the form plaintiff filled out to apply for her long term disability benefits, plaintiff indicated that "12/31/11" was her "[l]ast full day at work"[123] and several other documents indicate her last day of work to be December 19, 2011.[124] We found that for purposes of her coverage eligibility she did not cease to be a "Member" on any of these dates. But it may be that for calculation of predisability earnings, her last day of Active Work was in December 2011. If so, the prior year's earnings to calculate benefits would be 2010.

Because the parties only briefly touched on this issue, we will reserve ruling on this final dispute. The parties are to submit additional briefs outlining their positions.

---

[122] STND 00788.
[123] STND 00658.
[124] STND 00497, 00665; Def's Resp. to PFF ¶49.

**III.      Conclusion**

Plaintiff Carole Cheney's Motion for Entry of Judgment [dkt. 29] is hereby granted and Defendants Long Term Disability Insurance and Standard Insurance Company's Motion for Judgment [dkt. 38] is denied. The parties are to brief the calculation of predisability earnings issue. Plaintiff's brief is due on or before September 8, 2014 and defendants' brief is due September 22, 2014.

**ENTERED:**

Date:  August 28, 2014

_____
U.S. Magistrate Judge